

DA 20-0478

FILED

08/10/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0478

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 199

IN THE MATTER OF:

L.H.,

      A Youth in Need of Care.

FILED

AUG 10 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DN-18-56
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

    For Appellant Father:

        Shannon Hathaway, Driscoll Hathaway Law Group, Missoula, Montana

    For Appellant Mother:

        Dana A. Henkel, Terrazas Henkel, P.C., Missoula, Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

        Eileen Joyce, Butte-Silver Bow County Attorney, Butte, Montana

        Mark Vucurovich, Special Deputy County Attorney, Henningsen,
Vucurovich & Richardson, P.C., Butte, Montana

Submitted on Briefs: May 5, 2021

Decided: August 10, 2021

Filed:

_____
                Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1     Respondents A.H. (Mother) and D.H. (Father) appeal the separate but related September 2020 Youth in Need of Care (YINC) judgments of the Montana Second Judicial District Court, Butte-Silver Bow County, terminating their respective parental rights to L.H., born December 23, 2017. We address the following restated issues:

1. *Whether the District Court erroneously proceeded to YINC adjudication, temporary legal custody, and parental rights termination without a determination of L.H.'s eligibility for enrollment in the "Lakota Sioux Tribe"?*

2. *Whether the District Court erroneously terminated the parents' rights under § 41-3-609(1)(f), MCA, without adequate evidence under governing federal and state standards of a substantial risk of physical or psychological neglect?*

3. *Whether the District Court erroneously terminated Father's parental rights without adequate evidence under governing federal and state standards that his conduct or condition of unfitness was unlikely to change within a reasonable time?*

We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     The Montana Department of Health and Human Services (Department) became involved with L.H. at birth when the child's umbilical cord tissue tested positive for marijuana (THC), opiates, and codeine. Based on additional reports of illicit drug use and sales, the Department later intervened in May 2018 with a voluntary short-term, out-of-home protection plan structured to allow the parents to demonstrate the ability to be drug-free and safely parent L.H. The protection plan soon failed, however, resulting in Department removal of L.H. to a protective kinship placement, and the June 14, 2018, filing of a petition for emergency protective services (EPS), YINC adjudication, and

2

temporary legal custody (TLC). Based on Father's cursory assertion of his *possible* affiliation with the "Lakota Sioux Tribe," the Department gave notice of the proceeding to the Great Plains Regional Office of the federal Bureau of Indian Affairs (BIA) pursuant to 25 U.S.C. § 1912(a) of the federal Indian Child Welfare Act[1] (ICWA).[2]

¶3 At the show cause hearing[3] on July 18, 2018, the Department presented the uncontested testimony of a qualified ICWA expert that the parents' continued custody of L.H. would likely result in serious physical and emotional damage under the circumstances. On motion of one of the parents, the court then recessed and continued the hearing to a later date. After taking additional contested evidence at the continued show cause and combined adjudicatory hearing[4] on August 15, 2018, the District Court issued a bench order summarily adjudicating L.H. as a YINC and further summarily granting the Department TLC. Upon resumption of the hearing after a short recess, the State presented the after-the-fact testimony of the assigned Department social worker that "temporary legal custody is in the best interests of this child," and her statement of intent to craft appropriate reunification-oriented treatment plans for the parents. The District Court then summarily adopted "the recommendation of the department." A written judgment issued the next day

---

[1] 25 U.S.C. § 1901, et seq.

[2] The Department filed proof of service of the BIA notice on June 28, 2018. The proof of service indicated that the Department sent the notice to the "Lakota Sioux Tribe" at the published mailing address of the Great Plains Regional Office of the BIA.

[3] See § 41-3-432, MCA (YINC show cause hearing).

[4] See §§ 41-3-432(9) and -437(1)-(2), MCA (YINC adjudications at show cause hearings).

formally adjudicating L.H. as a YINC[5] based on "physical neglect for exposing the child to an unsafe living environment and physical and emotional harm" resulting from ongoing abuse of prescription drugs. The judgment further granted the Department TLC for a period of six months, until February 15, 2019. *Inter alia*, the written judgment expressly: (1) found that L.H. "is a member of or is enrollable in the Lakota Sioux Tribe"; (2) noted the prior testimony of a qualified ICWA expert that "continued custody of [L.H.] by the parents is likely to result in serious emotional or physical damage" based on the "established" facts; and (3) adjudicated that the "out-of-home placement of [L.H.] complies with the requirements" of 25 U.S.C. § 1915. At a subsequent uncontested hearing on November 14, 2018, the court approved and imposed stipulated reunification-oriented treatment plans for each parent.

¶4 However, on February 15, 2019, the underlying grant of TLC inexplicably expired without Department motion for extension, or other action, prior to completion of either parent's treatment plan.[6] A month later, the Department received correspondence from the Standing Rock Sioux Tribe (SRST) of North and South Dakota, dated March 8, 2019, certifying that L.H. was *not* eligible for SRST enrollment due to lack of the requisite "blood quantum."[7]

---

[5] See § 41-3-102(33), MCA (YINC definition).

[6] See § 41-3-442(2)-(4), MCA (TLC grant may not exceed six months unless specifically extended by court-order upon timely motion of the Department).

[7] See attachment to Affidavit of Child Protection Specialist, filed March 29, 2019. Except for the responsive duty of the Secretary of the Interior under 25 U.S.C. § 1912(a) "to provide the requisite notice to . . . the tribe," the intervening sequence of events or nexus between the Department's prior BIA notice and the subsequent SRST response to the Department is not a matter of record.

¶5 On March 29, 2019, six weeks after the initial grant of TLC inexplicably lapsed, the Department filed a second petition for EPS, YINC adjudication, and TLC based on: (1) the prior 2018 YINC adjudication; (2) the factual assertion that neither parent had made any substantial progress on their prior treatment plans; and (3) that the previously adjudicated safety risk to L.H. thus remained unabated. Based on the prior SRST non-eligibility determination, the second petition asserted that ICWA did not apply.

¶6 On May 1, 2019, at the initial show cause hearing on the second petition, both parents appeared with respective counsel and unequivocally stipulated to the petition. The District Court accordingly re-adjudicated L.H. as a YINC, granted the Department TLC for a new six-month term, and imposed new reunification-oriented treatment plans. Neither parent objected to or otherwise disputed the second petition assertion that ICWA did not apply. The 2019 treatment plans were substantially similar to the 2018 plans other than, as pertinent, an additional anger management class requirement to address subsequent Department concerns regarding domestic violence between the parents. On May 28, 2019, a written judgment issued formalizing the prior oral judgment.

¶7 On September 23, 2019, the Department petitioned for termination of both parents' parental rights on the asserted grounds that: (1) L.H. had been in out-of-home protective care for 15 months; (2) both parents failed to complete their respective treatment plans despite ample opportunity to do so; and (3) reunification was thus no longer in L.H.'s best interests.[8] On September 3, 2020, following a contested termination hearing on

_____

[8] See § 41-3-604(1), MCA (termination of parental rights "presumed to be" in "the best interests of the child" if "child has been in foster care under the physical custody of the state for 15 months

5

November 12, 2019, the District Court issued separate findings of fact, conclusions of law, and judgments terminating the parents' respective parental rights and granting permanent legal custody to the Department for appropriate placement. Despite some referenced progress, the court found, *inter alia*, that both parents largely failed to complete most, if not all, of the essential requirements of their respective treatment plans. The court further expressly found or concluded that: (1) ICWA did not apply to L.H.; (2) continuation of the parent-child relationship with the parents would likely result in continued abuse or neglect; and (3) termination of their parental rights was thus in the best interests of L.H. Both parents timely appeal.

**STANDARD OF REVIEW**

¶8     We review parental rights terminations under Title 41, chapter 3, MCA, for an abuse of discretion based on compliance with applicable Montana statutory and ICWA standards. *In re L.D.*, 2018 MT 60, ¶ 10, 391 Mont. 33, 414 P.3d 768; *In re D.B.*, 2007 MT 246, ¶ 16, 339 Mont. 240, 168 P.3d 691. An abuse of discretion occurs if a court exercises discretion based on a clearly erroneous finding of fact, erroneous conclusion of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or in excess of the bounds of reason resulting in substantial injustice. *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586; *D.B.*, ¶¶ 16-18. Findings of fact are clearly erroneous only if not supported by substantial evidence, the lower court misapprehended the effect of the evidence, or upon

of the most recent 22 months"). *See also* § 41-3-609(3), MCA (in considering whether a parent's "conduct or condition" of unfitness "is unlikely to change within a reasonable time" under § 41-3-609(1)(f) and (2), MCA, the "court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child").

our review of the record we have a definite and firm conviction that the court was otherwise mistaken. *L.D.*, ¶ 10; *In re D.H.*, 2001 MT 200, ¶ 14, 306 Mont. 278, 33 P.3d 616. We review conclusions of law de novo for correctness. *In re M.W.*, 2004 MT 301, ¶ 16, 323 Mont. 433, 102 P.3d 6.

## DISCUSSION

¶9    1. *Whether the District Court erroneously proceeded to YINC adjudication, temporary legal custody, and parental rights termination without a determination of L.H.'s eligibility for enrollment in the "Lakota Sioux Tribe"?*

¶10    Citing *In re S.R.*, 2019 MT 47, 394 Mont. 362, 436 P.3d 696, and *L.D.*, the parents separately assert, in essence, that the Department had a federal law duty under the circumstances of this case to send an ICWA notice and request for tribal eligibility determination to the "Lakota Sioux Tribe," as distinct from the SRST. They thus assert that, under the second petition filed after the inadvertent lapse of the 2018 TLC grant, the District Court erroneously proceeded to YINC re-adjudication, new TLC grant, and ultimately terminated their respective parental rights without obtaining a conclusive determination of L.H.'s eligibility or ineligibility for enrollment in the "Lakota Sioux Tribe." We disagree.

¶11    Enacted in 1978 to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families," ICWA imposes heightened federal standards for the removal of Indian children from Indian families. *See, e.g.*, 25 U.S.C. §§ 1902, 1911, and 1912(d)-(f). Whether ICWA applies to a proceeding under Title 41, chapter 3, MCA, depends on whether the subject child is an "Indian child." *See* 25 U.S.C. § 1912(a). In pertinent part, ICWA defines an "Indian child" as a person "under age

7

eighteen" who is either "a member of an Indian tribe" or "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). *See also* 25 U.S.C. § 1903(3) and (5) (defining related terms "Indian" and "Indian child's tribe"). When the court "has reason to know that an Indian child is involved" in an involuntary foster care or parental rights termination proceeding under Title 41, chapter 3, MCA, the Department must, upon reasonably diligent investigation of the "reason to know," immediately "notify . . . the Indian child's tribe" of "the pending proceedings and of [the tribe's] right of intervention" by registered mail, return receipt requested. 25 U.S.C. § 1912(a); *S.R.*, ¶ 15 (citing 25 U.S.C. §§ 1903(1)(i)-(ii), 1912(a), (d)-(f), 1915, 1922, and 25 C.F.R. § 23.2 (2016)). As referenced in 25 U.S.C. § 1912(a), a "reason to know" that a child is an Indian child is "no more than awareness of a reasonable basis upon which to believe" that the subject child is an Indian child. *S.R.*, ¶ 16 (internal punctuation and citations omitted).[9] A court may thus have a "['']reason to know that an Indian child is involved' if, *inter alia*, '[a]ny participant' or 'officer of the court involved in the proceeding' either 'informs the court that the child is an Indian child' or that the person has 'information indicating that the child is an Indian child.'" *S.R.*, ¶ 16 (quoting 25 C.F.R. § 23.107(c)(1)-(2) (2016)). What constitutes a "reason to know" that a child is

---

[9] Without altering or diluting its meaning, we have interchangeably paraphrased the discrete statutory phrase "reason to know" as a "reason to believe" or "reasonable basis upon which to believe" a child is an Indian child. *See, e.g.*, *In re D.D.*, 2021 MT 66, ¶ 11, 403 Mont. 376, 482 P.3d 1176; *S.R.*, ¶ 16 n.12; *In re J.J.C.*, 2018 MT 317, ¶ 15 n.2, 394 Mont. 35, 432 P.3d 149; *L.D.*, ¶ 13 (citing 25 U.S.C. § 1912(a)); *In re J.J.L.*, 2010 MT 4, ¶ 26, 355 Mont. 23, 223 P.3d 921; *In re J.M.*, 2009 MT 332, ¶ 21, 353 Mont. 64, 218 P.3d 1213; *In re C.H.*, 2003 MT 308, ¶ 20, 318 Mont. 208, 79 P.3d 822.

eligible for tribal enrollment "is a factual matter that will vary based on the particular record in each case." *S.R.*, ¶ 20. However, a "reason to know" generally "requires something more than a bare, vague, or equivocal assertion of possible Indian ancestry without reference to any identified Indian ancestors with a reasonably suspected tribal connection." *S.R.*, ¶ 21 (citing *In re Jeremiah G.*, 92 Cal. Rptr. 3d 203, 207-08 (Cal. Ct. App. 2009) and *In the Interest of Z.H.*, 740 N.W.2d 648, 653 (Iowa Ct. App. 2007)). If unable to determine "the identity or location of . . . the tribe" upon reasonable diligence, the Department must immediately give "notice . . . to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to . . . the tribe." 25 U.S.C. §§ 1901(1), 1912(a), and 1903(11); *S.R.*, ¶ 18. In either event, it is the duty of the Department, and ultimately the court, to obtain a tribal eligibility determination from the subject tribe when there is a "reason to know" that a child is eligible for enrollment in a particular tribe. *S.R.*, ¶ 18 (internal citations omitted).[10] *See also L.D.*, ¶¶ 14 and 17.

¶12    As a critical threshold matter here, however, ICWA applies only to children subject to involuntary foster care and parental rights termination proceedings who are eligible for enrollment or membership in a *federally-recognized* Indian tribe. *See* 25 U.S.C. § 1903(3)-(5) and (8) (definitions of "Indian," "Indian child," "Indian child's tribe," and "Indian tribe"). The Secretary of the Interior, by and through the BIA, periodically

---

[10] "Whether a child is eligible for tribal membership . . . is a question of fact for exclusive determination by the Indian tribe(s) in regard to which the court has reason to know the child may be related." *S.R.*, ¶ 18 (citing 25 C.F.R. § 23.108(b) (2016), *inter alia*). "A tribal determination of membership eligibility is conclusive as a matter of law." *S.R.*, ¶ 18 (citing *L.D.*, ¶¶ 14 and 25, and C.F.R. § 23.108(b) (2016)).

9

publishes, in the Federal Register, an exhaustive list of federally-recognized Indian tribes. *See, e.g., Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 85 Fed. Reg. 5462, 5462-67 (Jan. 30, 2020).[11] Neither now, nor at any time pertinent, has the "Lakota Sioux Tribe" been a federally-recognized Indian tribe. *See Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 85 Fed. Reg. 5462, 5462-67 (Jan. 30, 2020); 84 Fed. Reg. 1200, 1200-05 (Feb. 1, 2019); 83 Fed. Reg. 34,863, 34,863-68 (July 23, 2018); and 82 Fed. Reg. 4915, 4915-20 (Jan. 17, 2017).[12] Consequently, as a matter of law, the Department, and ultimately the District Court, had no duty under 25 U.S.C. § 1912 to give notice to and obtain a tribal eligibility determination from the "Lakota Sioux Tribe."

¶13    Father's wholly unsupported, vague, and equivocal assertion of *possible* eligibility for membership in the "Lakota Sioux Tribe" was insufficient alone to give the Department,

---

[11] *See also* 86 Fed. Reg. 7554, 7554-58 (Jan. 29, 2021); 84 Fed. Reg. 1200, 1200-05 (Feb. 1, 2019); 83 Fed. Reg. 34,863, 34,863-68 (July 23, 2018); and 82 Fed. Reg. 4915, 4915-20 (Jan. 17, 2017).

[12] As a purely ancillary contextual matter not essential to this opinion, we take notice that the descendants of the historical Great Sioux Nation are now largely dispersed among multiple tribes that historically spoke one of three different dialects (Lakota, Dakota, and Nakota) of the native Sioux language. In the United States, except as otherwise dispersed off-reservation, the Lakota Sioux, also known as the Teton Sioux, are now primarily comprised of seven tribal bands consolidated into five federally-recognized tribes—the Cheyenne River Sioux Tribe (Cheyenne River Reservation, South Dakota), Standing Rock Sioux Tribe (Standing Rock Reservation, North and South Dakota), Oglala Sioux Tribe (Pine Ridge Reservation, South Dakota), Rosebud Sioux Tribe (Rosebud Reservation, South Dakota), and Lower Brule Sioux Tribe (Lower Brule Reservation, South Dakota). See https://lakotavoice.com/history-of-lakota-tribe.php; https://www.lakotamall.com/history-and-ancestry; https://cheyenneriversiouxtribe.org/history; https://www.standingrock.org/History; https://oglalalakota-nsn.gov/history; https://rosebudsiouxtribe-nsn.gov/history-culture; https://www.lowerbrulesiouxtribe.com/lower-brule-territory; and https://www.bia.gov/regional-offices/great-plains/tribes-served.

or the District Court, any particularized "reason to know" that L.H. is eligible, or even *possibly* eligible, for membership in any particular federally-recognized Indian tribe. Nor have the parents articulated any other basis upon which further investigation by the Department would have been reasonably likely to result in such a "reason to know." The Department nonetheless complied with 25 U.S.C. § 1912(a) by immediately giving notice of the pendency of this proceeding to the BIA, regardless of the void of any record indication of the ensuing nexus that resulted in the SRST tribal non-eligibility determination. The record is thus void of any non-speculative basis, or even vague assertion, indicating a "reason to know" that L.H. is eligible for membership in any other *federally-recognized* tribe that descended from the historical Lakota Sioux. Under these circumstances, we hold that the District Court did not erroneously proceed under the second petition to a YINC adjudication, TLC grant, or ultimate termination of parental rights without notice to, and a tribal eligibility determination from, the "Lakota Sioux Tribe."

¶14     2. *Whether the District Court erroneously terminated the parents' rights under § 41-3-609(1)(f), MCA, without adequate evidence under governing federal and state standards of a substantial risk of physical or psychological neglect?*

¶15     Father and Mother next assert that the District Court erroneously terminated their respective parental rights under § 41-3-609(1)(f), MCA, without sufficient evidence to prove, under the applicable Montana statutory and/or ICWA standards of proof for a YINC

11

adjudication, that their alleged drug use subjected L.H. to a substantial risk of physical or psychological neglect.[13] We disagree.

¶16 As pertinent here, a court may adjudicate a child as a YINC upon a finding that the "acts or omissions of a person responsible for [his or her] welfare" has subjected the child to a "substantial risk" of physical or psychological neglect. *See* §§ 41-3-437(2) and -102(7)(a)-(b), 21(a)(i), (20), 23(a), and (33), MCA (YINC adjudication standard and definitions of "child abuse or neglect," "physical or psychological harm to a child," "physical neglect," "psychological abuse or neglect," and "youth in need of care"). The standard of proof in an ICWA proceeding is proof by "clear and convincing evidence." 25 U.S.C. § 1912(e). *See also* § 41-3-422(5)(b), MCA. The lower standard in a non-ICWA proceeding is proof by "a preponderance of the evidence." Sections 41-3-422(5)(a)(ii) and -437(2), MCA.[14]

¶17 Here, we need not address the evidentiary sufficiency, whether under ICWA or non-ICWA standards, of the initial out-of-home removal or YINC adjudication under the 2018 petition. The resulting grant of TLC, and related imposition of reunification-oriented treatment plans, lapsed and expired on February 15, 2019. As previously analyzed, ICWA did not apply under the second petition because, unlike before, there was no record "reason to know" that L.H. was an "Indian child" in wake of the Department's ICWA

---

[13] They seemingly similarly assert further that the District Court lacked sufficient evidence under §§ 41-3-427(1)(b)-(c), (2)-(3), -432(1)(b), (3), and (5), MCA, for authorizing the pre-petition removal of L.H. from their home and custody.

[14] For the different ICWA and non-ICWA standards of proof for pre-petition removal of a child, see 25 U.S.C. §§ 1912(e) and 1922; §§ 41-3-422(5)(a)(i), (b), -427(1)(b)-(c), and (2), MCA.

notice to the BIA under 25 U.S.C. § 1912(a), the resulting SRST non-eligibility determination, and the record void of any particularized "reason to know" that L.H. was eligible for enrollment in any other federally-recognized Indian tribe. Moreover, as to applicable non-ICWA standards under Title 41, chapter 3, MCA, the waiver effect of the parents' unqualified stipulations under the second petition precluded any subsequent assertion of error and resulting review regarding the evidentiary sufficiency of the 2019 reauthorization of the out-of-home placement, re-adjudication of L.H. as a YINC, and six-month TLC grant with related new treatment plans. Under these circumstances, we hold that the District Court neither erroneously re-adjudicated L.H. as a YINC under the second petition, nor later erroneously found under § 41-3-609(1)(f), MCA, that it had.

¶18    3. *Whether the District Court erroneously terminated Father's parental rights without adequate evidence under governing federal and state standards that his conduct or condition of unfitness was unlikely to change within a reasonable time?*

¶19    Father asserts that the court further erred in terminating his parental rights under § 41-3-609(1)(f)(ii), MCA, without sufficient evidence to prove, under the applicable Montana statutory and/or ICWA standards of proof, that his conduct or condition of unfitness was unlikely to change within a reasonable time. Again, we disagree.

¶20    As pertinent here, a district court may terminate a legal parent-child relationship if: (1) the child has been adjudicated as a YINC; (2) the parent has failed to comply with an appropriate court-ordered treatment plan; and (3) the parent's previously adjudicated "conduct or condition" of unfitness "is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. "In determining whether the conduct or condition of the

13

parent[] is unlikely to change within a reasonable time, the court shall enter a finding," upon consideration of various enumerated factors (including, *inter alia*, "excessive use of . . . [a] dangerous drug that affects the parent's ability to care and provide for the child"), "that continuation of the parent-child legal relationship will likely result in continued abuse or neglect." Section 41-3-609(2), MCA. In pertinent part, "abuse or neglect" includes, *inter alia*, a "substantial risk" of exposure of the child, through "the acts or omissions" of the parent, "to an unreasonable risk to the child's health or welfare by failing to . . . eliminate the risk." Section 41-3-102(7)(a)(ii), (b)(i)(A), (20), (21)(a)(v), and (23)(a), MCA. The non-ICWA standard of proof of the requisite termination criteria under § 41-3-609(1)(f), MCA, is "clear and convincing evidence." Section 41-3-609(1), MCA.

¶21 Here, viewed in the light most favorable to the judgment, the District Court expressly found that "[c]ontinuation of the parent[-]child legal relationship will likely result in continued abuse or neglect" based on Father's historical and ongoing illegal and/or abusive use of prescription drugs, and failure to substantially complete the requirements of his court-ordered reunification-oriented treatment plan despite ample opportunity to do so. While the judgment included no express finding that his condition of unfitness was unlikely to change within a reasonable time, such finding was manifestly implicit on the face of the judgment based on: (1) the express finding under § 41-3-609(2), MCA; (2) supporting record evidence; and (3) the relationship between § 41-3-609(1)(f)(ii) and (2), MCA. As previously noted, ICWA did not apply to proceedings under the second petition. Despite the presence of conflicting evidence, our review of the record indicates that the court's express and implicit findings under § 41-3-609(1)(f)(ii) and (2), MCA, were supported by

14

substantial record evidence, minimally sufficient to satisfy the state clear and convincing evidence standard based on the broad discretion of the finder of fact to determine the relative veracity, credibility, and weight of the evidence. We hold that the District Court did not erroneously terminate Father's parental rights under § 41-3-609(1)(f)(ii), MCA, without sufficient evidence to prove by clear and convincing evidence that his conduct or condition of unfitness was unlikely to change within a reasonable time.

## CONCLUSION

¶22 We hold that, under the second petition, the District Court did not erroneously: (1) proceed without an ICWA notice to, and a tribal eligibility determination from, the "Lakota Sioux Tribe"; (2) re-adjudicate L.H. as a YINC or later erroneously find under § 41-3-609(1)(f), MCA that it had; or (3) terminate Father's parental rights without sufficient evidence to prove by clear and convincing evidence under § 41-3-609(1)(f)(ii), MCA, that his conduct or condition of unfitness was unlikely to change within a reasonable time. Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

15

_____
Justices

16